Oyez, oyez, oyez, all persons having business before the Honorable, the United States Court of Appeals for the District of Columbia Circuit, are admonished to draw near and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated, please. Case number 16-1301, United States Department of Justice, Federal Bureau of Prisons, Federal Collectional Complex, Coleman, Florida, Petitioner v. Federal Labor Relations Authority. Mr. Walters for the Petitioner, Mr. Jacob for the Respondent. Good morning. May it please the Court, Tice Walters for the Federal Bureau of Prisons. With the Court's permission, I'd like to reserve five minutes of time for rebuttal. This case is controlled by the Court's decision in BOP-1. There, the Court explained that Article 18 contains procedures to, quote, assign officers to posts and designate officers for the relief shift. The Court further held that Article 18 covers and preempts challenges to all specific outcomes of the assignment process. Those holdings resolve this case. So all specific outcomes, the employer can redefine a job in any way it chooses, so long as the job it posts goes into the roster and they give the employees notice and they take preference by seniority and assign the rest onto a relief roster. Any way it changes a job is fine as long as it goes through that process. So long as the officers on the relief roster are doing what it says in Article 18G, which is to say filling in for posts of other correctional officers, that is correct. The substance of those assignment decisions is covered by the procedure. Is that limited to the same complex? What if the decision was made to send an officer to another state, for example? Well, Your Honor, the employees here are employees of FCC Pullman, so it's not clear whether they could be sent to an entirely different complex at which they are not employees of. Is there anything in your understanding of Article 18 that would prevent that, however? It's possible that the answer would be no. It's also possible that looking at things like the procedure for warden assignment and the fact that we're talking about officers of a particular complex, that they would not be permitted to do that. There's also no reason to do that. The entire guiding principle of these complexes is to have synergies between the different institutions, and there's separate regulations that deal with things like travel for workplace employees. So if... I guess what we're getting at is you've taken a very broad view of Article 18. I'm just trying to find out, are there limits to that? There are certainly limits, Your Honor. It's true that we have taken a broad view. Such as? Give me a limit. Help me understand. If the agency wished to change the procedures for workplace assignment in Article 18, that would certainly require bargaining. So if it wanted to give three weeks' notice rather than seven weeks' notice, or if it wanted to have employees bid by performance review rather than... Anything that complies with the procedures is permissible? So if, by complying with the procedures, the agency was essentially nullifying those procedures, that might also present a problem. So if, for instance, the agency was posting black rosters, but there were no positions on those rosters available for bidding so that everyone got lumped onto the relief rosters, that might also present a problem because it would be essentially nullifying the procedures in both 18d and 18g. But this Court's decision in BLP-1 is a broad decision, and Article 18... It seems so broad on the face of the It appears that as long as something is effectively run through that process, it's okay. And I'm wondering, in a situation like what we have here, where there are cross-unit or transfers, what if the employer required someone who ordinarily works in low security, when they went over into high security, to wear a badge? Hi, I'm Patrick. I'm from low security. Be nice to me. That wouldn't be anything that there would have to be impact in implementation bargaining over, right? So are the procedures in Article 18... Fully comply with those procedures. Fully comply with posting. Just, you know, we recognize some of the problems that the union's been raising about people coming into situations where they're unfamiliar and they have some safety concerns, they have some concerns about familiarity. So you're going to deal with that in a low-cost way, by requiring this badge. You know, hey, I'm the substitute teacher. Be nice to me. Well, Article 18 covers the substantive workplace assignments. Another article of the bargaining agreement might or might not cover the idea of wearing a badge. My hypothetical, it doesn't. But the employees say, that has a big impact on us. We think that's a terrible idea. You know how substitute teachers are treated in fifth grade. Well, this high security prison is not fifth grade. And you're really putting a target on our back by choosing that. You know, employer prerogative up to a point to choose how to run the workplace. But they're saying this has an impact on us. And under your theory, I think, the way you framed the breadth of the BOP decision, there's no impact or implementation bargaining there. Is that right? I don't think that's necessarily true. It might be the case. But it wouldn't be because of the BOP 1 holding. Because that, the aspect of wearing a badge isn't a substantive assignment decision. It would be another aspect of employer of work conditions. Well, it's assigning someone to a job that they've defined in a particular way. And it sounds like your reasoning is that they've redefined the jobs they're posting so that the relief roster employees, instead of understanding the job being relief at my level of unit, you're redefining that to be relief anywhere across the complex. And so they're saying, well, you know, by the same token, can't you run anything through that and just claim coverage by BOP under BOP 1? I want to be careful, Your Honor, because they haven't redefined the job of the relief roster. Article 18G sets out what the job of officers on the relief shift is. And it is to fill in for other officers who are on sick and annual leave. And that has not changed. The only thing that has changed is the breadth of jobs for which they could fill in, which is the same thing that changed in the BOP 1. Well, yes and no. I mean, when you apply to work at this complex, you apply for low or medium or high. You don't apply for the pan-complex job, right? My understanding is that's actually not right. They are applied to FCC Coleman and are hired to a particular institution after they have applied. They're hired to the entire complex. And then once they have gone through training, they are put into a particular institution, which then becomes their, quote, home. My understanding from the record was that the job is a job at a particular unit within the complex, a particular level of security. That's not the way you're hired in, though. You get assigned to a job, but you're hired by the whole complex. That's correct, Your Honor. And certainly, your home institution has a lot of practical effects, but that isn't in Article 18 or in the bargaining agreement. And the training you refer to, what would the difference in training be between a low security and a high security prison? So every correctional officer receives the same training. It's done at an initial training. It's done at a facility, I believe, in Georgia. It's a multi-week program. Everyone gets, no matter what sort of facility, they'll ultimately be at. There is eventually, once they arrive at FCC Coleman, they're given, I think it's one week of institution-specific training. So they'll be shown around and told how to do things. That said, the annual training that they receive, the refresher trainings, those are similarly every correctional officer gets. But haven't you just identified the fundamental problem with what's going on here? And that's taking someone who's been trained for the low security prison and, by virtue of the relief roster, putting them in a high security prison. That's a fundamentally different job, isn't it? No, Your Honor. First, and I'm happy to get into that, I would like to point out that the actual decision. But in terms of the actual safety impacts or the lack of training, there are two other articles within the master agreement, Article 27, which deals with safety and health, and Article 21, which deals with training. And if there were serious problems with safety, for instance, the union could file a grievance alleging that the agency had created health risk or safety risk through its actions, and that would be adjudicated in the normal way. But that's not what happened here. I mean, isn't that really the answer to most of what you're being asked? There are grievance procedures, and they're covered by other provisions in the contract. This provision, the only thing that the authority is focused on, is the scope of assignment provision. And I think what you're saying is, you don't know how you get around Judge Ginsburg's opinion, you're lying in the Department of Navy. That's exactly right, Your Honor. The agreement is contained in the agreement, and the union had it shot at bargaining. And if it didn't want something like this to occur, we gave them fair notice in those two opinions, then you'd better negotiate differently. Otherwise, your resort is a grievance procedure. That's exactly right, Your Honor. And it is also true that this is not a permanent ban on bargaining over these issues. It is during the life of the bargaining. That's what the contained in doctrine is. You negotiate what your contract is, you're bound by it. But you can go to file grievances, and all these things you've been talking about now are grievance procedure issues, and the grievance is there. How do you respond to the argument that at the time the master agreement was entered into, there really weren't such things as inter-institutional complexes? This is a new development that's changed the nature of the bargain. Well, the authority and the judge, and I am happy to answer the question, I do want to make sure we're secured some time for rebuttal. Sure, we'll give you time. The authority and the judge both acknowledged that complexes did exist when this was being negotiated. They were rare, according to the authority, and we're not challenging that. But the issue is not one of whether the parties anticipated at the time of bargaining that a particular impact or a particular situation would arise. That's the entire purpose of the doctrine and of the flexible procedures in Article 18, is to deal with the facts on the ground as they arise and to present a set of procedures for making assignments based on those facts. What is the role of the bargaining history in the 2010 settlement agreement, in your view? The parties to this agreement did act for a long time as if they understood intra-unit assignments not to be covered by the agreement. They did a lot of bargaining and they did the settlement all based on the assumption that these were impact and implementation issues. There was bargaining in this case, but prior to this court's BOP-1 decision, the law in this area was relatively unsettled. The authority had taken a very narrow view of the covered-by doctrine, and so in an abundance of caution, the agency did bargain for several years until the BOP-1 decision clarified the law at which point. And in that settlement agreement, the remedy for failure of bargaining is what? It's the reinstatement of the initial complaint. I mean, that's the oddity here. There's a settlement, whatever the parties thought. The settlement says, well, we agree to talk about this. The parties agreed to talk about it, and they both agreed that if it fails, we'll go back to where we are here, where the contained-in doctrine is in play again. That's exactly right, Your Honor. But they didn't bargain to failure. They stopped bargaining. They stopped bargaining, right. They did stop bargaining. The settlement agreement ties the duty to bargain to the statutory duty, and once the BOP clarified that there was no statutory duty, they were no longer bound. And as Judge Edwards pointed out, the remedy is reinstatement of the initial complaint and adjudication of whether the underlying conduct was an unfair labor offense. So, and we will give you extra time, but just dialing back, you can see that this case is under the inseparably bound up factor, or your position is that there's nothing that expressly covers it, but it's covered by because it's inseparably bound up with a subject expressly covered by the agreement. And how do we determine what's, you said that the history or the intent or the awareness, the reasonable expectation of the parties was when they entered into the agreement was part of our analysis of what counts as something that's inseparably bound up with the terms of the agreement? Apologies, Your Honor. It's not that it has no bearing. It certainly has bearing, but it's also not dispositive. If it were dispositive, the BOP, of course, would have come out differently because the opinion was very careful to note that the parties did not anticipate the change at issue there. But it was a type of change, economic downturn, that was obviously something that workers and employers always have to anticipate. I mean, similarly, of course, economic concerns for what part is motivating the policy here. It's similarly an attempt to avoid excessive overtime costs. But I mean, the question, of course, is just as the OP1 made clear, is the substantive assignment done in conformity with the agreement. We'll give you back three minutes. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honors. May it please the Court. My name is Fred Jacob. I'm a solicitor at the Federal Labor Relations Authority with Ms. Zach Hennigy, and together we represent the agency for the Court. The authority asks the Court to affirm its order, essentially because its order complies with the covered by doctrine and effectuates its purposes. The covered by doctrine ensures that parties get a bite of the apple and a fair opportunity to bargain matters at the table, and that in subsequent changes that happen after the agreement, that the authority attempts to effectuate the midterm bargaining. The authority has the right to effectuate a midterm bargaining obligation in a way that balances stability of the agreement with the promotion of collective bargaining that Congress intended. Mr. Jacob, what is the impact and implementation that the employer needs to bargain over here? What are some of the kinds of terms the authority believes are impact and implementation matters that might be obtained through bargaining were the agency to agree? Your Honor, I think the perfect example is what the parties did negotiate in their agreement from 2006 to 2008. It was safety orientation, ensuring that there was a chain of command that was available, ensuring that guards who were assigned to a camp institution have the opportunity to go to a like institution before going to, so they would go to medium security before they would go to a penitentiary high security. And why isn't the grievance procedure an adequate response to that, as Judge Edward is pointing out? I think the grievance procedure obviously would, there are cases involving grievance procedure, certainly under Article 18, but the grievance procedure only applies to matters that are covered by the contract. And I think what the parties demonstrated here was that their belief is that this was not a contract because they negotiated it in 2006, they negotiated it again in 2009, then they negotiated it again in 2011. So presumably, the union didn't feel that this was an adequate subject for the grievance procedure. The fact that the union, whether or not the union is happy or unhappy with what they agreed to is not the question. And that's one of the burdens of the covered by doctrine. You know where I'm coming from. You get your shot at bargaining. What happened here is within the scope of Article 18. It clearly is. It's a matter of the sort covered by Article 18. There can't be any dispute about that. And you may not like it, but there can be no doubt that this matter is within the sweep of Article 18. The covered by doctrine says you had your bite. Now the fact that the parties keep talking about these things, that's just real life stuff. And the thing that, as soon as I read the case, I was like, wait, what is that 2010 agreement? And it was interesting for me on how you were going to hedge on it. And the import of that 2010 amendment is it says, it promises nothing of the sort that you're claiming. It says if we can't work out something, we're willing to talk about this thing. But if we can't work out something, we're right back here. Well, Your Honor, I think your point is exactly the right point, which is the parties had their shot to negotiate in 1995 to 1998. But what the fact findings here demonstrated is that the agency between the time that the negotiations were transpiring and the time of this change underwent a significant operational change that fundamentally changed the manner in which it operated federal correctional complexes. The fact finding that the authorities engaged in demonstrated that during the time the contract was negotiated, that there were two, maybe three institutions in the entire country of over a hundred institutions that had multiple facilities in the same complex, that employees did not transfer among those facilities, that assignments weren't made among those facilities. But that doesn't answer my concern, that what happened here is still within the scope of 18. Well, Your Honor, what I... Let me just tell you, I think you understand. I understand. 18 doesn't list everything that might arise in the following years. It says this is the broad picture and there are certain requirements we have to follow. And if we do it, we don't know what the situations are. And that's not against us. There could be things we can't even imagine. But here's what we agree to do with respect to all those situations within the scope of 18. That's what the contained in doctrine is. Well, Your Honor, I think what the authority would suggest is that this was a exercise of my right to assign that had not previously been exercised during the course of that agreement. No doubt. And beyond that, with all due respect, I think what you are suggesting is that the union, practically, that if the union wanted to address these matters during the course of the master agreement bargaining from 1995 to 1998, it would have had to engage in entirely speculative bargaining. No, they would have had to say, if circumstances... For example, if circumstances change within the employment complex, we have a right to reopen bargaining to reconsider. That's really very simple. And it's done. And I don't know... Here's my problem. And again, you have to understand this. You read Judge Ginsburg's opinion. I don't care whether someone thinks it's too broad or not. It's precedent. Sure. I don't know how you possibly get around it. I don't know how you get around my opinion in the Department of Navy. Well, I think... I'm sorry. Go ahead. I think both are distinguishable. I think if we are... Well, I think both are distinguishable in the sense that if we're attempting to retrofit these decisions, Department of the Navy, which predated the authorities covered by doctrine and the BOP case from 2011 into the authorities case law, what the court was saying in both is that both of these matters were on the table. The authority of the party should have reasonably contemplated that this would foreclose further negotiations because it was eminently clear, or at least reasonably clear to the parties that in Department of the Navy, Navy would exercise its right to detail employees. Right. And that some people might not like what happened. That in BOP1, the agency might... The prison might change some of the positions on the roster. People knew that in 1995 that the management was going to produce a roster and it would have some positions on it. Well, and one of the things in BOP... Sorry. I'm just interested to know what you think about this. Since I was reading BOP1, it seemed that one of the things that really animated the court was it just didn't seem like there was anything that the union was actually seeking other than, let's get rid of the mission critical program. There weren't... On the employees that could be really subject to negotiation, they're just like, we're going to dig in here. We want to negotiate about this because we don't like it. And that was one of the animating aspects of BOP1. We're not in that situation here, as I understand it. How are you going to write that opinion? You know exactly what I'm going to say. How are you going to write that distinction when we're thinking about what I'm talking about in contained in? It doesn't write. The contained in doctrine is you're saying if you're within the scope of this, if anything within the scope of this provision comes up, here's what I, the employer, agree to do. I'm going to follow these procedures. That's it. I'm not giving you anything more than that. And if you want more, you should have asked for it. For example, if it's a new context, new employees, new building, all bets are off. That's not what you have. I don't know how you write what my colleague just asked. How do you write that? The union really feels strongly about this. So what? I think the distinction, Your Honor, is the point that Judge Pillard made in Judge Ginsburg's opinion in 2010. He stated that one of the really troubling aspects was that this arbitrator said there's no status quo anti-gremedy, that essentially if we went back to the table, the agency would still be able to do the same thing. There was no obvious answer to what would be bargained over. Whereas here, the parties have demonstrated exactly what would be bargained over and why it was important. What would happen? You're not really answering my question. But in any event, so what happens if they are made to bargain? I think if the authority's order is affirmed and the parties go back to the bargaining table, it is very clear what they can bargain over. And they would bargain over matters that were not contemplated or on the table in 1998. What happens? Play it all the way through. And the employer says, no. The employer says, well, then it would go to the impasses panel. And the impasses panel would impose an agreement if that was appropriate, which is the federal sector process. And I would step back to also say that I believe the Supreme Court in NEPI in 1999 and this court in 2006 both said that determining the contours of the midterm bargaining obligation is the authority's role. And the authority's order should be enforced if reasonable. Now, here's the irony is, I knew the answer to your question. I wanted to hear it. Okay. Go to the impasses panel. Isn't it ironic in 2010, it's not a weighty agreement because the union agreed, we're not going to insist that if this fails, it goes to the impasses panel. Well, Your Honor, I mean, What it does is come back to where we are now. Your Honor, in the settlement agreement, you're talking about the bargaining No, no, I don't have a settlement agreement. With all due respect to opposing counsel who said that agency counsel just came to the table and said, we had an epiphany that this would cover it by. If you read the judge's opinion, what the unfair labor practice finding is, is that the agency played a rope-a-dope with the union for a year and a half, refusing to bargain in good faith, refusing to meet at reasonable times, changing bargaining representatives. It never once said at the bargaining table that it believed it didn't have a bargaining. That was all after BOP. That was after the BOP decision. I'm sorry, Your Honor. I believe it was, some of it was contemporaneous. Some of it was before BOP. So what's the, what's your response to the notion? Sure, you say, oh, practice, custom, and usage. We have to interpret the agreement in light of this. Look at all this practice. Look at the settlement agreement. Look at how everybody understood that this was impact and implementation subject matter. And they say, yeah, but, you know, the background of all of that is to the extent that the law so requires. And once we know the law doesn't require it, that is just wiped clean. What's your response to that? Well, my understanding, Your Honor, is that that is standard language in our settlement agreements that covers times where a union might. Which is standard. I'm sorry, the, we will bargain to impasse agreement or as far as the statute requires, because often agencies are afraid that a union might come to the table and promote, offer a non-negotiable proposal. Right, well, they're saying, yeah, that's standard language for a reason. Many things that we put into contracts or agreements in the law is dormant and seems until it's not. And they're saying, this is where it's not. What's your response to that? Well, I think the response is, there are two responses. One is that it would be absurd for the agency to sign an agreement saying it had an intention to bargain in good faith over a matter. And then basically pull the agreement out as a reason to say, no, we're not going to bargain in good faith. It seems, it's very circular. Second is that the, that provision, that provision talking about the settlement agreement, it's a breach of the settlement agreement, isn't the violation here. The violation is the refusal to meet and bargain in good faith. No, but you're looking to the settlement agreement and to the bargaining over the 26 agreement as evidence of the party's practice, custom, and usage. And as I take it, their response to that is, fine, that was practice, custom, and usage in a different legal landscape. Now that we know that we didn't have to do it, we look back and we see that was effectively voluntary bargaining because we're good people. And when we don't have to do it, we don't want to. And your response to that, other than we still think it's legally required, BOP1 doesn't change that for the reasons that you said before. But does, how do we figure in, or can we figure in the practice, custom, and usage? Well, I think it is, the answer is that it is one factor in many factors that are based on the record here and hearing facts that demonstrate the practice, custom, and usage to this prong two analysis. The prong two analysis is, it is more tethered to the specific bargaining expectation at the table and whether the parties reasonably would have believed that the negotiations or matter would foreclose further bargaining. How do we decide whether something is, what is it, inseparably bound up? What's your test for that? And I'm going to ask the other side that as well. It's a little, it's your best case and what's your test for what counts as inseparably bound up? It is a multi-factor test, Your Honor. I think what the, again, the authority is looking to, if the contract explicitly doesn't address it, then how do we determine whether or not it should have a broad preemptive effect, like Judge Edwards has suggested these contracts should? So the authority is exercising its discretion to determine the breadth of the preemptive effect of a contract provision. So the authority does look, it reviews the contract language. It reviews other language in the contract to determine whether or not, whether it sheds light on it. And it reviews the negotiating history and then how the parties have exercised the, have acted after the contract. Could they have filed a grievance making the claim that this Article 18 doesn't cover this? It's unclear. There's nothing in the record saying, perhaps. This is the larger theory that we're talking about. Neither you nor the NLRB, the case law says, should be fooling around in the party's agreements, and that you do not have that authority. And that the contained in doctrine is a way to try and police both you and the board. And the parties negotiate what they negotiate. And if one side says, no, you're reading this is wrong, there's a grievance procedure. And that's also in their agreement. They've agreed if they have contractual disputes, they ought to be resolving them pursuant to their contractual arrangements. You're arguing a different thesis, which is you and the NLRB should always be able to wander in and decide what the contracts mean. And if you think there's more things that ought to be negotiated, that it's appropriate. There's a lot of case law that says you're just dead wrong on that. That's not your responsibility. Well, Your Honor, I think there is a, well, I think one important distinction between the authority and the board comes out of this court's decision in Enloe Medical Center, which is an NLRB case. This court discussed the board, and I see I'm over my time, but if I can continue. As long as we're asking questions, you can talk. I'd like to ask a question. This court said in Enloe that the board was in a very, was in treacherous territory. Because it was imposing effects bargaining obligations based on contractual interpretations, and it had no business in the world of contract interpretation dealing with that. Exactly what you just said, Judge Edwards. But what it said is it compared it to the First National Maintenance context, where it said, look, this is a statutory non-negotiability, statutory issue of non-negotiability in the First National Maintenance issue. So the board is on sounder footing imposing effects bargaining there. I think we are in that world, because what Congress said in 7106 of our statute, it said there are a bunch of management rights, including the management right to assign. There are impact and implementation bargaining rights, and authority, you sort it out. So you get the opportunity, you know there's going to be a contract, you need to figure out when impact and implementation bargaining is appropriate. Are you taking issue with BOP1 then? Isn't that your real problem, that your argument's with BOP1. Let me ask you to respond to this language. BOP1 said Article 18, quote, covers and preempts challenges to all specific outcomes of the assignment process. Doesn't that address exactly what you're saying? You may not like BOP1, maybe it was too broad, but that's the law that we have to follow. How do you get out from under that very broad language, all specific outcomes? There's no question that's incredibly broad language. And if the court only focuses on that language, untethered to the specific matter at hand here, then it's... No, what does that mean? Well, what it means is that, and I don't mean to be glib, that the authorities test analyzes each particular matter... We're told all specific outcomes. The effects bargaining is required by Article 18. It says what it says. The effects bargaining is required by the statute. I mean... No, no, it's a different context. So, I mean, there's no question it's broad language. And I think the answer is that A, that the assignment... I mean, your briefing takes a lot of pot shots at BOP1, right? And there's this sort of subtle suggestion that we ought to fix it, that somehow it was in error, and maybe a suggestion that we ought to fix it. Well, I think our brief is... Obviously, the authority disagreed with the outcome in BOP1, but I think it is distinguishable because it deals with a different exercise of the assignment power. The assignment power and the facts in that case were very different. Sorry. I'm sorry, Your Honor. I was just checking with my colleagues to see if they had any more questions. I didn't need to be rude to you. You were not. I mean, I think to answer your question is... And we're not suggesting or trying to take pot shots at BOP1. I think one thing that is true about BOP1, unlike this court's NTU decision from 2006, is that NTU methodically went through the authority's test and applied the authority's test. BOP1 did not do that. And I think it's really important to recognize that the authority has developed a test over 25 years since this court's decision in the methodical, consistent fashion that looks at the party's reasonable expectations at the bargaining table. And so, there's a broad language in BOP1. There's no question. But every case needs to be taken on its own facts. Great. Thank you very much. Thank you, Your Honor. I appreciate it. Thank you, Your Honors. Just three very brief points in regards to that last discussion. BOP1 authoritatively interpreted the covered by test as applied to this provision of this bargaining agreement. So, whatever tensions there may be in between the authority's test and the BOP1 decision, this is not the proper case to examine those. In regard to the assertion that there was a fundamental change in the working conditions by use of the consolidated relief roster, that's simply not true. Well, at the time of negotiation, a permanent transfer was the only way that an employee would be assigned from one unit to the other. Isn't that right? That's absolutely correct, Your Honor. So, the position you're taking is really, it is kind of requiring bargaining over hypotheticals, that there has to be some kind of term in every agreement saying, well, if there's a new context, if there's new buildings, if the size of the facility becomes far flung, so we have to commute to go from low security meetings, all of those things, we have to put in there and say, if these kinds of changes happen, then we'll go back to the bargaining table. That's your position? Or is that implicit? That would certainly be one way to resolve it. The facts of this case, the substantive impact on the correctional officers is not significantly different than the impact in BOP-1. In BOP-1, the authority had found, quote, that there was a nationwide change in staffing patterns that affected virtually every bargaining unit employee. And the jobs being performed by officers on the relief roster... I know you say the authority didn't rely on the safety, but that looms large here, doesn't it? That's a huge change to sign up and be trained for going to a low-security prison and find out that you're going to have to work in a high-security prison. That would affect me. Safety is certainly of extreme importance to the agency, Your Honor. There are the other procedures for grieving a safety issue, but also... What's been going on? I'm sorry. I finished answering your question. Officers on the relief roster already deal with inmates of all security types. For instance, if you are guarding the SHU, the special housing unit, you may very well, even in a low-security prison, have a higher-security prisoner in the SHU because that person was segregated from other inmates at his or her own institution. And the changes being performed by officers on a day-to-day basis on the relief roster... One day, they might be guarding the special housing unit. One day, they might be on night shift patrolling the grounds. Another day, they might be in a tower. Those are already large as the difference from working across the street. When everyone has the same training and there's the same basic procedures in place, they're given the same equipment, there's not... I think there's a reason that the authority didn't rely on the safety impacts in its decision here. Mr. Walters, what's been going on with the... Has this been operating satisfactorily for some time? What's the status quo now in terms of how these cross-institutional relief assignments are being used? My understanding is they continue to be used in the consolidated relief roster. And the parties did negotiate a new collective bargaining agreement that took effect in 2014 and is still in effect. And that, of course, is long after this all began. And there is nothing in that collective bargaining agreement discussing consolidated rosters, discussing inter-institutional assignments. The agreement is not in the record, Your Honor, but it is available publicly online. And again, it's not in the record, but that does seem probative of the... I guess I've forgotten that. The parties have a new agreement. 2014 to 2017 is the date, but it has been extended up until now, much as the 1998 agreement was... If the authority wins here, what would the relief be? I'm not entirely certain, Your Honor. I'm not certain either. Get a new agreement, go back and retroactively bargain about the terms of the prior agreement? I just didn't recall that the agreement had been renegotiated. And it does bear some similarities, I think, to the Department of Navy case where the court made clear that if the parties had reached the exact same agreement once the facts on the ground were already known, that no one would doubt that those facts were covered by the agreement. And so it seems strange to say that merely that change in time was the sponsor. I'd like to... When we finish, I'd like to hear what the authority thinks their relief would be. I just didn't recall it. My fault for not thinking about this, but I don't understand what the relief would be, as I understand labor law. Is there still a live controversy? The question that we have to ask is, is the question moot? I don't think so, Your Honor, because were the authority's decision affirmed, I mean, it did order the parties to go bargain over... With respect to the terms of a pre-existing contract. I agree it would be strange relief, Your Honor. No, I mean, it is borders on jurisdictional, like my colleague says. What's here? I don't understand what's here. The authority may take on a new case with the same issue and there may be a new fight, but I don't see how this fights here. I don't know what the relief could be. I think, Your Honor, I mean, I need to look at the exact remedy here, but I mean, I think they could probably still be forced to return to the bargaining table. I don't see that, because the point was, given an agreement that didn't cover this, and the position is that reasonable negotiators at the time would think that, well, if such a change comes up, that would be subject... The authority's view is that would be... If such a change were to take place, that would be subject to impact and implementation bargaining. Therefore, we don't need to negotiate over it. Therefore, it's not their view covered by 18G. Your view after BOP1 is, oh, it is covered by new day dawns, new agreement. It doesn't matter what's covered by the old agreement, because now they can be... You all can be explicit. There's a new history now. I'm not getting it. I certainly want to hear from the authority, because I don't know why the case is removed. Yeah, that certainly makes sense, Your Honor. I would point out that the actual, just the terms of the order, just say, with the union regarding the assignment of employees on the second annual relief process. Why don't we hear from Mr. Jacob, and then we'll give you time to come back. Mr. Jacob? The question is mootness. Always exciting in the Court of Appeals. You never know what's going to come up. Your Honor, a couple of responses. First, there's nothing in the record about the renegotiated agreement. Doesn't matter. Well, I would point out that... We can answer that information if it goes to mootness and jurisdictional question. Absolutely, and I would bring up a jurisdictional question, which is that section 7123 of the statute precludes this court from considering any issues that were not brought up to the... No, no, no. This is a larger jurisdictional matter. Your Honor, if I may. All right, so let's get to the larger section. I will bring up two points. One is, the agency obviously knew that it had renegotiated the agreement, did not bring it up to the authority in its exceptions, did not bring it up while the exceptions were pending, did not bring it up in a motion for reconsideration after the authority's decision. Point one, so on a 7123 matter which goes to this court's jurisdiction, this court cannot consider matters that were not brought up to the authority, and how that would affect... Our concern, Mr. Jacob, is like a case or controversy concern. What is the case or controversy? The case or controversy is that, yes, there is... If you look at the authority's order on pages 8 through 9 of the joint appendix, it does... It finds that the agency... It directs the agency to cease and desist from failing or refusing to bargain in good faith. The notice to employees incorporates its bad faith bargaining. So not just that it refused to bargain over the contract, but that it refused to come to the table. So for instance, we will not unreasonably delay or threaten to terminate negotiations over the assignment of employees. We will not cancel or place unreasonable conditions on meetings to negotiate over the assignment of employees. So there are very specific unfair labor practices that took place during the bargaining. Was the negotiating for the new agreement in bad faith? Did they refuse to come to the bargaining table? I mean, I'm just not sure why a whole new chapter of bargaining and the agreement that infractions that the ALJ found with respect to that, why there's... What live effect do they still have on the new contract or the relationship between the parties? I think, A, there are prospective aspects of the authority's order. There are retrospective aspects of the authority's order. Prospective, the affirmative actions are to bargain in good faith. They also include posting this notice, which remedies the prior bad faith bargaining, which took place under the old agreement. It also includes agreeing not to engage in similar kinds of delaying tactics and placing unreasonable conditions on bargaining in the future. So there are retroactive... Or there are prior bad acts that need to be remedied and that the authority's order goes to remedy. It's not only go sit down at the table. Now, I have not read the new agreement. I don't know what the terms of the new agreement look like because the agency didn't put it in the record. And this is the first time on rebuttal that it has brought this information to either the attention of the authority or to this court. That said, I certainly would appreciate, of course, opportunity if the court thinks there's a live issue about case of controversy to go back to our offices and brief the court on it. Like I said, my initial instinct is that there are prior bad acts that are remedied in this order and that certainly prospective bargaining over impact implementation of this assignment still has not yet been done. And what's the status of it? I mean, this order was in place, but pending appeal to us, I mean, did these employees get notice or...? I don't believe the agency has complied with the authority's order. And that's the standard that they won't comply with it if there's a...? I mean, I think the authority... How do you know? They just negotiated a new contract covering this matter. Well, my understanding is, I believe our regional office is in charge of seeking compliance, of effecting compliance with unfair labor practice findings. If there had been a notice posting, presumably we would have found out. So my understanding, I think, is a typical practice when an agency files a petition for review of an authority order, the authority will put compliance in advance until the court has had an opportunity to speak to that matter. What I'm trying to say is that one of your concerns is what they're going to do in the future. They bargained a good faith in the future. They came to a new agreement. No one's suggesting that their bargaining there was impermissible. The union hasn't raised any... So what's there left to effect? They went ahead and bargained, as the law required, and they reached a new agreement over this matter. I can't speak to that, Your Honor. We're speculating what happened on the table. We're speculating what the contract looks like. All I can say is that, like I said, there was prior bad acts that this order also remedies, and that the employees of BOP should know the agency will not commit again. Mr. Walters, you want to...? Thank you very much, Mr. Jacobs. What should we do? What should we do? Well, I wanted to offer Your Honors that if it would be helpful to have supplemental briefing on the Moody's issue, we'd be happy to submit that to the court. We'll discuss it in our conference. Absolutely, Your Honors. Otherwise... Oh, and I also wanted to apologize for not having brought the 2014 agreement to the attention of the court. I hadn't realized it at the time. Hadn't realized what? That the 2014 agreement was in effect at the time. You didn't realize it either? No, right now, Your Honor. What are you all doing? That's really strange. Well, we were working with the record that was recorded. Thank you, Your Honor. Okay, thank you very much. I just couldn't resist.
judges: Griffith, Pillard, Edwards